In re GORDON CAR AND TRUCK RENTAL, INC. Debtor.

Bankruptcy No. 85–00709.

United States Bankruptcy Court, N.D. New York.

Nov. 25, 1985.

Hiscock & Barclay, Syracuse, N.Y., for Avis, Inc.; George S. Deptula, of counsel.

Menter, Rudin & Trivelpiece, P.C., Albany, N.Y., for American Motors Leasing Corp. and AMC Leasing Corp.; Jonathan D. Deily, of counsel.

Felt, Hubbard, Hopkins, Utica, N.Y., Bach & Bogan, for debtor; Brett Martin, of counsel.

STEPHEN D. GERLING, Bankruptcy Judge.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

This matter comes before the Court pursuant to a motion filed by Avis, Inc. and Avis Rent-a-Car System, Inc. (AVIS) requesting the Court to modify the automatic stay imposed by § 362(a), Title 11, U.S.C. (Code). AVIS moves the Court in accordance with the provisions of § 362(d)(1) of the Code. It seeks permission from the Court to terminate a series of license agreements it has with Gordon Car and Truck Rental, Inc. (Debtor) which conveys to the latter the exclusive right to use the name and logo of AVIS in its five car and truck rental operations.

American Motors Leasing Corporation and AMC Leasing Corporation (collectively, AMC), who claims a priority security interest in the license agreements, and the Debtor, filed affidavits in opposition. The parties appeared and presented their respective positions at a hearing before the Court on October 29, 1985. In addition, the parties submitted numerous additional documents, including supplemental memoranda and affidavits, to further elucidate their arguments.

The facts, which appear to be uncontroverted, are as follows:

1. On August 28, 1985, the Debtor filed for protection from its creditors under Chapter 11 of the Code.

2. Prior thereto, between 1956 and 1969, Debtor and AVIS executed and entered into nine exclusive licensing agreements which provided the Debtor with the sole right to use the AVIS logo and name in operating AVIS rental car and truck companies in Utica, Ithaca, Elmira and Binghamton, New York and solely a rental car company in Corning, New York (collectively, License Agreements).

3. Each License Agreement contains the following termination clause:

"In the event of the insolvency ... of Licensee, ... or if the Licensee files proceedings in bankruptcy ..., then this agreement shall automatically terminate, together with all rights and interests of Licensee hereunder, without any notice to Licensee."

4. ¶ 3 of Exhibit A attached to the Debtor's Chapter 11 petition indicates Total Assets of $1,694,395 and Total Liabilities of $1,772,741.

5. Prior to the Petition, Debtor and AMC entered into two "Master Fleet Vehicle Lease Agreements" (Lease Agreements) whereby AMC leased over 100 automobiles to Debtor for use as rental cars.

6. On or around July 31, 1985, prior to the petition, a New York State Supreme Court seizure order was issued authorizing AMC to repossess approximately 125 motor vehicles from the Debtor based on a finding of fact that Debtor was in default on the terms of the Lease Agreements. The order was issued under N.Y. CPLR § 7102(d) which allows a court to issue a seizure order without making a final determination, but in reliance on the plaintiff's affidavit establishing it is probable plaintiff will prevail on the merits. The State Court order contains findings of fact which provide that Debtor "is in default under the terms and provisions" of the Lease Agreements with AMC. In addition, the Court found Debtor was in default on its underlying note with AMC. Counsel for AMC and Debtor agreed that although the State ordered seizure, the autos were voluntarily surrendered by Debtor.

7. AMC also received and filed a judgment, on August 21, 1985, in the Oneida County Clerk's Office against the Debtor in the amount of $627,242.75.

8. Although AVIS contends the effect of the above actions demonstrate Debtor was insolvent prior to the petition and thus the License Agreements were terminated prior to the petition, AVIS states it did not learn of the Debtor's insolvency until two days before the date of Debtor's Chapter 11 petition. Counsel for Avis stated Avis learned of Debtor's problems on August

26, 1985, but he does not know how this information was obtained.

9. No notice of termination was ever served by AVIS on the Debtor before or after the Debtor's petition.

10. From at least July 1, 1985 through August 26, 1985, there were ongoing and serious negotiations between AVIS and Debtor concerning a possible purchase by AVIS of the License Agreements.

11. It is alleged by Debtor that prior to the petition, AVIS made a binding offer for the License Agreements in the amount of $600,000.00 and that Debtor accepted said offer by letter mailed August 23, 1985 and a follow-up telegram sent August 26, 1985. AVIS disputes this. Debtor claims it is evaluating the purportedly binding offer and may request permission to assume it as an executory contract.

12. The terms of the License Agreements grant AVIS the right to examine and audit Debtor's books and records, without notice, at all reasonable times during business hours.

## DISCUSSION

It is the position of AVIS that the Debtor was insolvent prior to the petition. AVIS argues the License Agreements, pursuant to the insolvency provisions, terminated pre-petition. Therefore, AVIS contends said License Agreements are not "property of the estate" under Code § 541(a) and the Court should order the stay lifted to allow AVIS to terminate same. AVIS cites the case of *In re LJP, Inc.*, 22 B.R. 556 (Bankr. S.D.Fla.1982) for the proposition that a creditor may lawfully terminate a contract prior to the petition, through utilization of a contract provision authorizing termination without notice upon the occurrence of a debtor's insolvency.

The License Agreements themselves are silent concerning the method of determining "insolvency". In general, there are two recognized definitions of insolvency. 30 N.Y.Jur.2d, *Creditors' Rights*, § 417 (1985). One test asks whether the debtor is unable to pay its debts as they come due in the ordinary course of business. *Id.* The second test asks whether the entire value of debtor's property is less than the total of debtor's debts. *Id.*

AVIS asserts the applicable test is the "common law" test of insolvency, *i.e.*, whether the debtor is paying its debts as they come due in the ordinary course of business.

It is the position of the Debtor, as joined by AMC, that the Debtor was not insolvent under the common law test. However, Debtor contends the "balance sheet" insolvency test, *i.e.*, whether the value of assets is less than the sum of all liabilities less contingent or disputed claims, is the proper test to determine insolvency. Debtor states, however, that under either test, Debtor was not insolvent. Therefore, Debtor avers the License Agreements did not automatically terminate pre-petition; thus they remain property of the estate under Code § 541(a).

In the alternative, the Debtor and AMC argue that should the Court determine Debtor was insolvent pre-petition and thus the License Agreements validly terminated pre-petition, then AVIS' actions thereafter constitute a waiver of such termination. Debtor and AMC assert AVIS waived its rights to exercise the termination provisions in the License Agreements because:

First, it negotiated and offered to purchase the License Agreements from Debtor after the purported insolvency of Debtor;

Second, AVIS possessed a right to inspect Debtor's books and records and in failing to exercise same it cannot now assert it did not know of Debtor's financial position;

Third, under the terms of the License Agreements, AVIS received regular financial reports from Debtor which clearly established Debtor was suffering continuous financial deterioration; and

Fourth, under the terms of the License Agreements, AVIS received a percentage of revenue fees and the amount paid to AVIS has steadily declined for two years pre-petition.

Debtor contends that based on the above factors, AVIS clearly knew or should have known of the Debtor's insolvency and since it continued to treat the License Agreements as viable, AVIS is now barred from asserting the License Agreements terminated prior to the petition.

AVIS responds by alleging it was wholly unaware of the financial problems of the Debtor until August 26, 1985, two days prior to the instant Chapter 11 petition. AVIS contends its efforts to purchase the License Agreements from the Debtor were conducted in good faith and without any knowledge of the insolvency of the Debtor. Further, it contends the mere fact it possessed a right to examine Debtor's books and records does not impose a duty to do so and thus, it cannot be held accountable for information which it would have uncovered had it exercised such right. AVIS did not address Debtor's other points concerning AVIS' knowledge obtained through receipt of Debtor's monthly reports and the declining amount of revenue fees received from Debtor.

Finally, Debtor replies that AVIS is a sophisticated entity which would not enter serious purchase negotiations without first checking into the financial condition of the Debtor. AVIS responded that Debtor's position is untenable as the prospective purchase agreement provided that all outstanding liabilities would be paid prior to effectuation of the agreement.

There are several issues present:

1. Is the termination provision in the License Agreements, which provides for automatic termination upon insolvency without any notice, enforceable?

2. If yes, what insolvency test is to be utilized in determining whether the Debtor was in fact insolvent pre-petition?

3. Assuming the Court determines the Debtor was insolvent pre-petition, did the subsequent actions of AVIS constitute a waiver of AVIS' right to terminate the License Agreements pre-petition.

## TERMINATION PROVISION

At the outset, the Court notes if AVIS' position is sustained, in effect, termination of the License Agreements will terminate Debtor's Chapter 11 case as the License Agreements are Debtor's main asset. Further, the law is well settled that equity abhors forfeitures. *151 W. Assoc. v. Printsiples*, 92 A.D.2d 76, 80, 459 N.Y.S.2d 605 (1st Dep't 1983). In addition, the Court is constrained to construe ambiguous or unclear contract terms against the drafter. *Simon v. Etgen*, 213 N.Y. 589, 107 N.E. 1066 (1915).

Although the parties gave cursory comment to the first issue, the Court is concerned by any termination clause of a contract which provides for termination and forfeiture without any form of oral or written notice.

After extensive research conducted by the Court, it has been unable to find many cases which address the question whether a termination clause, which is purportedly effective without notice or any action by the creditor, is enforceable. 22 N.Y.Jur.2d, *Contracts*, § 433 (1985) analyzes the situation as follows: "A requirement that notice be given will not be read into an agreement which provides that it may be terminated by either party at any time, but which contains no provision as to notice of termination." In addition, New York case law consistently states the maxim that "where the parties have agreed to a termination clause, it must be enforced as written." *Noah v. L. Daitch & Co.*, 22 Misc.2d 649, 652, 192 N.Y.S.2d 380 (Sup.Ct.1959); *A.S. Rampell, Inc. v. Hyster Co.*, 3 N.Y.2d 369, 165 N.Y.S.2d 475, 144 N.E.2d 371 (1957) (although the decision expressly applies Oregon law, it appears to state the New York position as well); *Cycleway v. Kawasaki Motors Corp.*, 77 Misc.2d 829, 354 N.Y.S.2d 812 (Sup.Ct.1974). Furthermore, it has been clearly established by the Court of Appeals that courts should not interfere with contractual obligations of parties. *Graf v. Hope Bldg. Corp.*, 254 N.Y. 1, 171 N.E. 884 (1930).

960

There are few reported cases addressing the present issue. The court in the case of *Sinkoff Bev. Co., Inc. v. Schlitz Brewing Co.,* 51 Misc.2d 446, 273 N.Y.S.2d 364 (Sup. Ct.1966) upheld a contract term which provided for termination, without cause and without any notice. The court found the termination clause was not unconscionable under the Uniform Commercial Code (U.C. C.). Although, it appears, the instant proceeding is not controlled by the U.C.C., the analysis in *Sinkoff* is helpful. The court appeared to place strong emphasis on the fact the parties agreed in the contract that no notice of termination was required.

Finally, the Court notes the case of *151 W. Assoc. v. Printsiples, supra.* The contract in *Printsiples* contained an insolvency termination clause which required notice of termination. The court found the facts failed to establish the debtor's insolvency so that the clause could not be implemented. However, there is dictum which suggests that as a result of § 365(e)(1) of the Bankruptcy Code, which voids the effect of insolvency termination clauses after the commencement of a debtor's bankruptcy case, Congress has made an express statement of public policy that unexpired contracts should not be terminated solely because of insolvency forfeiture provisions. *Id.* 92 A.D.2d at 79, 459 N.Y.S.2d 605. The court stated "[i]f such a clause is not to be given effect after the commencement of a bankruptcy proceeding, there can be even less justification for doing so in the absence of a proceeding." *Id.*

The Court has reviewed and analyzed *Printsiples.* Although it appears to void insolvency termination clauses outside of bankruptcy, such language was not necessary for disposition of that case. Consequently, after weighing the above authorities, in the case *sub judice,* as the License Agreements indicate the parties expressly agreed to the termination clause without notice, the Court will enforce same as written.

MEANING OF INSOLVENCY

The next issue is what meaning of insolvency is to be applied to the terms of the

License Agreements. As noted, the agreements themselves are silent concerning same. AVIS contends the "common law" insolvency test controls, while the Debtor and AMC assert the "balance sheet" test controls.

As noted, the "common law" insolvency test provides as follows: Whether there is a "general inability on the part of the debtor to pay its obligations as they become due in the regular course of business." *Abrams v. Manhattan Consumers Brewing Co.,* 142 App.Div. 392, 396, 126 N.Y.S. 844 (1st Dep't 1911); *see also, American Castype Corp. v. Niles-Bement-Pond Co.,* 266 App.Div. 557, 560, 42 N.Y.S.2d 638 (1st Dep't 1943); 30 N.Y.Jur.2d *Creditors' Rights* § 417 (1985). In contrast, the "balance sheet" insolvency test provides as follows: Whether the entire value of a debtor's assets is less than the entire value of the debtor's debts, excluding contingent or disputed liabilities. 30 N.Y.Jur.2d *Creditors' Rights* § 417 (1985); *Paulding v. Chrome Steel Co.,* 94 N.Y. 334 (1884).

The Debtor desires the "balance sheet" test to be applied as it points to the amended Exhibit A, attached to its petition, which demonstrates that $2,060,084.99 of the $3,071,714.44 total listed liabilities constitutes disputed, contingent and unliquidated debts. Therefore, Debtor avers that when the $3,071,714.44 original total liabilities is reduced by the $2,060,084.99 above referenced, total liabilities equal $1,011,629.45. Thus, Debtor contends, this figure compared to the total asset figure of $1,613,626.08, demonstrates the Debtor is solvent under the "balance sheet" test.

There is no sound answer to the question of which insolvency test should be applied to interpret the License Agreements. AVIS cites *American Castype Corp. v. Niles-Bement-Pond Co., supra* as authority for the common law test. The facts in *Castype* involved a dispute between a licensor and licensee as to possession of certain chattels. Essentially, the plaintiff, a successor to the original licensee alleged the licensor converted certain chattels

which plaintiff contended were its property under the license agreement. The agreement contained an insolvency termination clause. The licensor alleged the original licensee, plaintiff's predecessor, had become insolvent and had, therefore, lost any right to possession of the property by operation of the terms of the agreement. The agreement did not define insolvency. *Id.* at 558, 42 N.Y.S.2d 638.

The Court found the meaning of "insolvent" to be a question of law; it defined insolvency as an "inability to meet obligations as they mature in the ordinary course of business." *Id.*

Although AMC and Debtor assert this is not the proper test to apply to the instant proceeding, they fail to cite any supportive authority for their position. AMC cites the case of *In re Wil-Low Cafeteria,* 22 F.Supp. 617 (S.D.N.Y.1937), *rev'd on other grounds,* 95 F.2d 306 (2nd Cir.1938), for the proposition that the definition contained in N.Y. Debtor Creditor Law § 271(1), which is basically the balance sheet test of assets over liabilities, controls only in fraudulent conveyance cases. While the Court does not take issue with this position, it fails to see how it supports AMC and Debtor's position.

In *Wil-low Cafeterias, supra,* the Court held that although there is no clear and final answer as to what test of insolvency controls when interpreting a contract which is silent as to the definition, the "time-honored" common law test, (inability to pay ones debts as they come due in the ordinary course of business) controls "when there is no statute in force that specifie[s] another meaning." 22 F.Supp. at 619. The Court stated further that the common law test "is the meaning commonly attached to insolvency by the New York courts, unless some other definition is demanded by statute." *Id.*

 In the instant case, neither party cites any statutory provisions which require application of either insolvency test. Therefore, the Court finds the License Agreements are controlled by the common law meaning of insolvency. Consequently,

the Court must make inquiry as to whether the Debtor, prior to the petition, was unable to pay its debts as they came due in the ordinary course of its business.

In support of its position that the Debtor was insolvent pre-petition, AVIS, in its papers and at the hearing, refers to the state court actions concerning the Debtor and AMC. As noted, the state court issued a repossession order and entered a judgment in behalf of AMC against the Debtor in the amount of $627,242.75. AVIS appears to rely solely on these actions in support of its position.

In response, the Debtor and AMC assert that although the state court repossession order made a factual finding that Debtor was in default on the Lease Agreements with AMC and the state court entered a monetary judgment against Debtor, these actions alone fail to establish the Debtor was not generally paying its debts as they came due. Debtor and AMC assert the evidence presented fails to satisfy the common law insolvency test. They contend it is clear that simply because the Debtor failed to pay one creditor, AMC, is insufficient to establish a pattern of failing to pay ones debts as they accrue. Therefore, it is the position of the Debtor and AMC that AVIS' allegation that the Debtor is insolvent under the common law test is unsupported by the evidence presented.

The Court realizes Debtor's schedules list creditors in excess of 150; however, the mere existence of creditors on the date of the petition does not provide evidence that the Debtor was insolvent on or before the petition date.

 Upon consideration of the parties' positions, the Court is inclined to adopt the position of the Debtor and AMC. In review of the facts presently before the Court, it is clear Debtor has failed to pay its debt owed to AMC; however, the common law definition appears to require an inability to pay ones *"debts"* as they come due in the ordinary course of business. By its very terms, this test contemplates the failure of a debtor to pay more than one

debt. *Matter of Goldsmith,* 30 B.R. 956, 963 (Bankr.E.D.N.Y.1983) (interprets the common law insolvency meaning in accordance with essentially the identical language used in § 303(b) of the Code). Clearly, the Court cannot find that prior to the petition, the Debtor was not generally paying its debts as they came due in the ordinary course of business.

## WAIVER

If, however, the Court assumes, arguendo, the Debtor was insolvent pre-petition, the Debtor alleges AVIS' subsequent actions constitute a waiver of its rights under the termination clause.

Debtor and AMC state that if the Court finds the License Agreements expired pre-petition, then the fact that AVIS continued to deal in a "business as usual" stature with the Debtor including the fact AVIS engaged in serious negotiations concerning purchase of the License Agreements, constitutes a waiver of AVIS' rights to terminate the License Agreements pre-petition.

In contrast, AVIS takes the position that it had no knowledge of Debtor's insolvency until two days prior to the petition. Although, under the License Agreements, it had the unilateral right to inspect and examine Debtor's books and records, it did not have a duty to make such inspection, and as it failed to do so, AVIS asserts it cannot be charged with any knowledge it might have uncovered.

■ Waiver is a question of intent. *In re Wil-Low Cafeterias,* 95 F.2d at 309. "A waiver is an intentional abandonment or relinquishment of a known right or advantage which, but for such waiver, the party would have enjoyed.... The intention to relinquish the right or advantage must be proved.... The evidence must have probative force sufficient to prove that there was in fact an intention to waive the right or benefit—a voluntary choice not to claim it." *Alsens A.P.C. Works v. Degnon Cont. Co.,* 222 N.Y. 34, 37, 118 N.E. 210 (1917); *see also Beacon Term. Corp. v. Chemprene,* 75 A.D.2d 350, 356, 429 N.Y.S.2d 715 (2nd Dep't 1980). In addition, contract terms

may be waived by implication or express intention of the party for whose benefit the provision inures. 22 N.Y.Jur.2d, *Contracts,* § 330 (1985); *see, Matter of Finkle,* 44 A.D.2d 731, 354 N.Y.S.2d 169 (3rd Dep't 1974). This definition necessarily requires the party charged with waiver to have possessed prior knowledge of such right prior to the purported waiver.

In the instant proceeding, AVIS avers it did not know of the insolvency of the Debtor until two days pre-petition. Therefore, AVIS contends it could not waive its rights under the insolvency termination clause.

In contrast to AVIS' position, Debtor and AMC allege AVIS is a sophisticated entity which would not engage in purchase offers of approximately $600,000.00 for the License Agreements without first, insuring the viability of the License Agreements, and second, without investigating the fiscal condition of the Debtor. Although AVIS rebuts the latter point, in part, by asserting the purchase agreement would have required Debtor to clear all liens and encumbrances against it, the Debtor argues AVIS knew or should have known of the nature of Debtor's financial situation as the License Agreements provide for a percentage of revenue fees to be paid to AVIS and that for up to two years pre-petition, the amount of these fees were continuously being reduced.

■ In review of the License Agreements, the Court notes ¶ 3 therein requires the Debtor to remit monthly reports to AVIS setting forth, *inter alia,* total rental time and mileage charges assessed and the number of cars then on rental or available for rental during the preceding calendar month. In addition, as noted, AVIS had the right to inspect and examine Debtor's books and records at any reasonable time. Although Debtor and AMC cite no authority which would establish a duty on AVIS to exercise such inspection right or be held accountable for anything it could have found if it exercised said right, the Court believes on the present facts, whether such a right creates a concomitant duty need not

be decided in determining whether AVIS knew or should have known of Debtor's financial insolvency.

Based on the facts present, if the Debtor was determined to be insolvent prior to the petition, the Court makes the finding that AVIS knew or should have known of Debtor's financial condition prior to the petition. Thus, it is determined AVIS waived any rights it may have possessed to terminate the License Agreements pre-petition based on the insolvency termination clause.

Therefore, based on the foregoing, it is

ORDERED, AVIS' request to modify the automatic stay to allow it to terminate the License Agreements be, and the same hereby is, denied as the License Agreements were in effect on the date of Debtor's Chapter 11 petition.